UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

SIMON J. RICHARDSON,                  :
                Plaintiff,            :
                                      :
        v.                            :        CA 07-309 ML
                                      :
WHITMARSH CORPORATION and             :
BROTHER JOHN MCHALE,                  :
                Defendants.           :

**REPORT AND RECOMMENDATION**

David L. Martin, United States Magistrate Judge

        Before the Court is a motion for summary judgment filed by
Defendants Whitmarsh Corporation ("Whitmarsh") and Brother John
McHale ("Brother John") (collectively "Defendants").  <u>See</u>
Defendants' Motion for Summary Judgment (Document ("Doc.") #55)
("Motion" or "Motion for Summary Judgment").  Plaintiff Simon J.
Richardson ("Plaintiff" or "Richardson") has filed an opposition
to the Motion.  <u>See</u> Objection to Defendants' Motion to Dismiss
[sic] (Doc. #59) ("Opposition").  The Motion has been referred to
me for preliminary review, findings, and recommended disposition
pursuant to 28 U.S.C. § 636(b)(1)(B).  After listening to the
arguments presented, reviewing the memoranda and exhibits
submitted, and performing independent research, I recommend that
the Motion be granted.

**I.  Claims**

        Reading his pro se Complaint[1] generously, <u>see</u> <u>United States</u>

---

        [1] The operative complaint in this matter is the complaint which
Plaintiff filed in the Providence Superior Court.  Although after the
action was removed to this Court Plaintiff filed an Amended Complaint
(Doc. #4), he did so without permission of the Court or the consent of
Defendants.  <u>See</u> Order Dismissing Amended Complaint (Doc. #9) ("Order
of 10/16/07") at 2.  The Amended Complaint was also problematic in
other respects, <u>see</u> <u>id.</u> at 3-4, and the Court granted Defendants'
motion to dismiss it, <u>see</u> <u>id.</u> at 4.  In dismissing the Amended

v. Genao, 281 F.3d 305, 313 (1st Cir. 2002)("courts should read pro se complaints less strictly than lawyer-drafted pleadings"), Plaintiff alleges that Defendants violated state and federal laws by: 1) removing him in February of 2005 from his position as a classroom teacher and replacing him with an uncertified teacher, see Complaint ¶¶ 14, 19-20; 2) placing him on paid leave in August 2005 for four months from his position as a residential counselor after he attempted to exercise a "reasonable accommodation" for his disability to which Defendants had allegedly agreed, see id. ¶¶ 44-56; 3) requiring him to work a schedule beginning in November 2005 which resulted "in a constant state of sleep deprivation," id. ¶ 63; see also id. ¶¶ 58-66; 4) promoting another employee who was less qualified (or no more qualified) than Plaintiff, see id. ¶¶ 67-72; and 5) giving Plaintiff a tepid evaluation and a two percent (instead of a four percent) raise in June 2007, see id. ¶¶ 80-82.  Plaintiff contends that the last four actions were acts of retaliation. See Memorandum of Law in Support of Plaintiff's Objection to Defendants' Motion to Dismiss ("Plaintiff's Mem.") at 2 (alleging that Defendants retaliated by placing Plaintiff on a four-month leave of absence and then offering him a "ludicrous schedule" that negatively affected the terms and conditions of his

---

Complaint, the Court specifically noted that "[t]he effect of this ruling is to leave the original Complaint as the operative Complaint in this matter."  Id. at 4.

Plaintiff subsequently sought leave to file a seconded amended complaint.  See Plaintiff's Motion for Leave to File a Second Amended Complaint (Doc. #10).  The Court denied this motion because it was not accompanied by a copy of the proposed second amended complaint.  See Text Order of 11/6/07; see also District of Rhode Island Local Rule ("DRI LR") Cv 15 (requiring that a motion to amend a pleading be accompanied by "the proposed amended pleading").  The denial was without prejudice.  See Text Order of 11/6/07.  However, Plaintiff never filed another motion for leave to file a second amended complaint.  See Docket.  As a result, the original complaint remains the operative complaint.

employment); Complaint ¶¶ 67-75 (appearing to allege that
Defendants' promotion of Ivy Booth (and not Plaintiff) was
retaliatory in nature); Complaint ¶¶ 80-82 (alleging that
Defendants retaliated against him by giving him a tepid
evaluation and only a two percent raise).

## II.  Facts

### A.  Background

Whitmarsh is a private, non-profit organization that
operates a network of group residences for troubled boys between
the ages of 12 and 18.  Defendants' Statement of Undisputed Facts
("SUF") ¶ 1.  Brother John is Whitmarsh's executive director, and
he has served in that capacity since 1971.  SUF ¶ 2.  In addition
to the group residences, Whitmarsh also operates a school for
troubled boys called the Vision School.  SUF ¶ 3.  The Vision
School is not part of the Providence School Department, nor is it
part of any other public school department.  SUF ¶ 4.

In the fall of 2002, Plaintiff experienced some work-related
difficulties with his employer at the time, the Providence School
Department.  SUF ¶ 5.  In November 2002, Plaintiff was placed on
a disciplinary administrative leave by the Providence School
Department.  SUF ¶ 6.  Approximately a week after being placed on
administrative leave, Plaintiff's parents persuaded him to visit
Rhode Island Hospital.  SUF ¶ 7.  At some point during the visit,
Plaintiff decided that he wanted to leave Rhode Island Hospital,
but he was restrained from doing so by hospital personnel.  SUF ¶
8.  Plaintiff was then involuntarily transferred to St. Joseph's
Hospital and held at that facility for approximately eight days.
SUF ¶ 9.  While at St. Joseph's Hospital, Plaintiff was diagnosed
as having suffered from a manic episode, and he was also
diagnosed with a narcissistic personality disorder.  SUF ¶ 10.
Plaintiff was discharged from St. Joseph's Hospital on December
4, 2002.  SUF ¶ 11.

Although he took some medication to treat his medical condition during the first four days he was at St. Joseph's Hospital, Plaintiff did not take any medication for his condition thereafter.  SUF ¶ 12.  Plaintiff has never taken any medication to treat mania, bipolar disorder, or any related condition since his hospitalization in November 2002.  SUF ¶ 13.  Since his single manic episode in November-December 2002, Plaintiff has never had another episode of mania or a recurrence of manic-like symptoms.  SUF ¶ 14.

After being discharged from St. Joseph's Hospital, Plaintiff remained on administrative leave from the Providence School Department.  SUF ¶ 15.  Plaintiff never returned to active employment with the Providence School Department, and he was terminated from that employment in May 2003.  SUF ¶¶ 16-17.

**B.  Employment by Whitmarsh**

**1.  As a Math Teacher**

In December 2003, Plaintiff interviewed for employment with Whitmarsh.  SUF ¶ 18.  Other than some part-time work as a substitute teacher at the International Institute, see Plaintiff's Response to Defendant's [sic] Statement of Undisputed Facts under Rule 56 ("Response to SUF") ¶ 19, Plaintiff had been unable to secure employment since being terminated from his position with the Providence School Department in May 2003, SUF ¶ 19.  Plaintiff was seeking any type of employment that might be available at Whitmarsh.  Id.  After interviewing with Brother John and the principal of Whitmarsh's Vision School, Kevin Jackson, and participating in an observation session at the 20 Eighth Street residence and the Vision School, Plaintiff was offered a position with Whitmarsh teaching math at its Vision School.  SUF ¶ 20.  Plaintiff never indicated to any Whitmarsh representative during the application and interview process that he had any type of disability, medical condition, or impairment,

4

SUF ¶ 21, nor did he indicate or otherwise disclose that he had a record or history of disability or impairment, SUF ¶ 22.

Plaintiff began working for Whitmarsh as a math teacher at its Vision School in December 2003.  SUF ¶ 23.  The student body at the Vision School was dissimilar from what Plaintiff had previously experienced working as a teacher in the Providence School Department in that all the students at the Vision School are male, are troubled in some way, and have some relationship or connection to the Rhode Island Department of Children, Youth, and Families ("DCYF").  SUF ¶ 24.  The Vision School's student composition also includes students who have been expelled from the Providence school system.  SUF ¶ 25.  Fights between and among students at the Vision School are common, and all or nearly all students whom Plaintiff taught at the Vision School had previously been in trouble.  Id.  According to Plaintiff, Brother John and Kevin Jackson informed him that the school curriculum at the Vision School was unimportant and unnecessary.  SUF ¶ 26.  As compared to the Providence public school system, there was more of an explicit focus on maintaining order in the classroom and controlling behavior at the Vision School during the time Richardson taught there.  SUF ¶ 27.  Plaintiff continued working for Whitmarsh as a math teacher at the Vision School until February or March 2005.  SUF ¶ 28.

## 2.  As a Residential Counselor

In February or March 2005, Brother John informed Plaintiff that he had decided to remove Plaintiff from his position as a math teacher.  SUF ¶ 29.  According to Plaintiff, Brother John explained his decision by stating that he was concerned about a disruption in staffing at the Vision School in the event that Richardson was granted reinstatement to his former job as a teacher in the Providence School Department.  SUF ¶ 30. Plaintiff had previously indicated to both Brother John and Kevin

Jackson that he expected to be reinstated to the Providence
School Department.  SUF ¶ 31.  Plaintiff indicated to Brother
John that he wanted to continue working for Whitmarsh and was
aware that there was a job opening for a second shift residential
counselor at the Eighth Street residence.  SUF ¶ 33.  Brother
John told Plaintiff to discuss the potentially available
counselor position with a Whitmarsh employee who handled human
resource and personnel issues at the time, Tim Patterson, and
Plaintiff did so.  SUF ¶ 34.  Within a day or two, Patterson
agreed to place Plaintiff in the counselor position as Plaintiff
had requested.  SUF ¶ 35; Response to SUF ¶ 35.

Plaintiff was scheduled to immediately begin work in his new
residential counselor position on the second shift, with eight
hour shifts Tuesday through Saturday.  SUF ¶ 36.  Plaintiff
suffered no interruption or diminution in his salary or benefits
as a result of transferring from the math teacher position to the
second shift counselor position.[2]  SUF ¶ 37.  Having previously
filled in as a substitute counselor during school vacations,
Plaintiff already understood the job functions and duties of his
new full-time position.  SUF ¶ 38.  The essential duties and
responsibilities of the residential counselor position at
Whitmarsh include: being a key member of the therapeutic
treatment team for residents; implementing individualized
treatment plans for residents; monitoring each resident's
behavioral goals; participating in staff, group, and individual
treatment meetings; processing day-to-day incidents with
residents in an appropriate manner; participating in regular
restraint training, and, when necessary, physically managing and

---

[2] Plaintiff notes, however, that as a counselor he did not have
"the benefit of actually working as a teacher."  Plaintiff's Response
to Defendant's [sic] Statement of Undisputed Facts under Rule 56
("Response to SUF") ¶ 37.

restraining residents; and providing support to the school and
school personnel in the event of a crisis at the school.   SUF ¶
39.

Plaintiff did not disclose that he had any type of
disability or impairment, or that he had any record of being
disabled or impaired, in connection with his transfer to the
second shift residential counselor position.   SUF ¶ 40.
Plaintiff also did not request any type of accommodation to
perform his new job as a residential counselor at the time he was
transferred into the position.   SUF ¶ 41.

### 3.  Oral Notice of "health problems"

In mid-to-late July 2005, Plaintiff was a participant in a
work-related meeting with a supervisor, Ivy Booth ("Booth"), and
another Whitmarsh employee.   SUF ¶ 42.   Plaintiff alleges that
Booth spoke to him in a way that he found "personally offensive,"
SUF ¶ 43, and that her remarks also indicated that she did not
have a correct understanding or interpretation of the events that
precipitated the meeting, id.   Later the same day, Plaintiff
sought out Booth to discuss his concerns about the way she had
spoken to him during the three-party meeting.   SUF ¶ 44.   Booth
agreed to meet with Plaintiff.   SUF ¶ 45.

When they met, Plaintiff expressed to Booth his concerns
about what had transpired in the earlier meeting.   SUF ¶ 46.   He
told her that he believed her perception of the relevant facts
and circumstances precipitating the earlier meeting were
inaccurate, that he was offended by the way she had spoken to
him, and that he believed that her communication style,
particularly with respect to less educated subordinate employees,
was not especially effective.[3]   Id.   Plaintiff further indicated
to Booth, for the first time, that he had experienced some

---

[3] According to Plaintiff, Booth apologized for her conduct.
Response to SUF ¶ 46.

"health problems" and that, although he did not want to get into any specifics, he qualified under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101, as an individual with a record of having health problems, or words to that effect, SUF ¶ 47.  At the time, Plaintiff did not inform Booth about the nature of his health problems or alleged disability, nor did he indicate that he was impaired or substantially limited in performing any major life activity.  SUF ¶ 48.  Plaintiff did, however, indicate to Booth that he needed to minimize the level of stress he experienced and that he may occasionally need to remove himself from situations he found to be stressful.  SUF ¶ 49.

The next day, Plaintiff spoke to another Whitmarsh supervisor, David Carr ("Carr"), and advised him of the conversation he had had with Booth the prior evening.  SUF ¶ 50.  Richardson did not identify the nature of his past health problems to Carr, nor did he indicate that he had any type of impairment.  SUF ¶ 51.

### 4.  Written Invocation of ADA Protection

In a July 29, 2005, letter to Brother John, Plaintiff wrote:

> This is to inform you that I have verbally informed David Carr and Ivy Reeve[4] that I qualify as a protected individual under the Americans with Disabilities Act.  I will be requesting reasonable accommodations in the near future.  My health care providers are W. Tyler Smith, M.D., and Michael Burkhart, Ph.D.
>
> I hope to communicate some concerns I have about an increasingly hostile working environment at 20 Eighth Street.  Hopefully, this can be done in as private a manner as possible.

SUF ¶ 52.

Plaintiff decided to write to Brother John rather than

---

[4] Ivy Reeve is also known as Ivy Booth.  See Complaint ¶ 69.

attempting to communicate with him verbally because he did not
have a chance to interact with him often.  SUF ¶ 53.  Plaintiff
wanted to meet with Brother John both to discuss his claimed
protected status under the ADA and also to discuss increasing
concerns he had about Booth's communication style and what he
perceived to be ineffective management techniques she was
employing.  SUF ¶ 54.

### 5.  August 2005 Meeting with Booth

On or about August 3 or 4, 2005, before Plaintiff got the
opportunity to meet with Brother John, he became involved in a
conflict among residents and another counselor emanating from the
selection of television programming.  SUF ¶ 55.  According to
Plaintiff, the residents were physically fighting.  Response to
SUF ¶ 55.

Later that same day, Booth asked Plaintiff to attend a
meeting with herself and one of the residents involved in the
fight.[5]  SUF ¶ 56; Response to SUF ¶ 56.  Plaintiff understood
the purpose of the meeting as an attempt to achieve a resolution
to the conflict that had arisen which was satisfactory to Booth
and consistent with her understanding of Whitmarsh's
organizational goals.[6]  SUF ¶ 57.  Plaintiff also believed that
the meeting was an attempt by the resident to convince Booth to
help him evade the consequences of his actions.  Response to SUF
¶ 57.  Prior to the conclusion of the meeting, Plaintiff left the
meeting.  SUF ¶ 58; Response to SUF ¶ 58.  Booth expressed
disbelief when it became apparent that Plaintiff was leaving the

---

[5] The Court has modified SUF ¶ 56 to take account of Plaintiff's
statement that the "conflict," SUF ¶ 56, involved a "physical fight,"
Response to SUF ¶ 55.

[6] Plaintiff disputes SUF ¶ 57 on the ground that there was an
additional purpose to the meeting.  See Response to SUF ¶ 57.  The
Court has, therefore, stated this additional purpose in the next
sentence.

meeting.[7]  SUF ¶ 59; Response to SUF ¶ 59.  Plaintiff responded that he had to excuse himself from the meeting and that he and Booth had "discussed this."  SUF ¶ 60.

In stating to Booth that they had "discussed this" while walking out of the conflict-resolution meeting, Plaintiff was referring, in part, to his conversation with Booth approximately a week or two before in which he had indicated to Booth that he needed to minimize the level of stress he experienced and that he may need occasionally to remove himself from situations he found to be stressful.  SUF ¶ 61.  In response to Plaintiff's statement that they had "discussed this" as he was leaving the meeting, Plaintiff believes that Booth replied that "I'll talk to you later," SUF ¶ 62, but Plaintiff had already left the room at that point, id.

### 6.  Placement on Paid Leave

When Plaintiff reported for work the next day, August 5, 2005, he was told by Carr that he was being sent home.  SUF ¶ 63.  Brother John's secretary had already scheduled a meeting for Plaintiff with Brother John to discuss Plaintiff's July 29, 2005, letter to Brother John.  SUF ¶ 64.  The meeting was scheduled to take place after August 4, 2005.  SUF ¶ 65.  When Plaintiff reported to work on August 5th, he was informed by Carr that he needed to have his meeting with Brother John before continuing to work.  SUF ¶ 66.

On August 9 or 10, 2005, Plaintiff attended his scheduled meeting with Brother John.  SUF ¶ 67.  At that meeting they discussed Plaintiff's claimed protected status under the ADA and

---

[7] Plaintiff in responding to this fact states that Booth expressed "mild disbelief," Response to SUF ¶ 59, at his leaving the meeting, see id.  At his deposition, Plaintiff testified that Booth "expressed disbelief," Plaintiff's Deposition Transcript ("Dep. Tr.") at 193, without indicating the degree of that disbelief, see id.  Accordingly, the Court finds that Defendants' SUF ¶ 59 is supported by the record.

Plaintiff's placement on leave status as a result of Plaintiff
leaving the August 4, 2005, conflict-resolution meeting with
Booth and the Whitmarsh resident prior to the conclusion of that
meeting.  SUF ¶ 68.  Plaintiff and Brother John also may have
discussed Plaintiff's application for employment with Whitmarsh,
completed in December 2003, wherein Plaintiff had responded "no"
to an inquiry concerning whether he had any disabilities that may
interfere with the performance of his job duties, and Plaintiff's
concerns regarding Booth's management style.  SUF ¶ 69.
Plaintiff indicated to Brother John during their meeting that he
had previously been hospitalized, but Plaintiff is unsure whether
he told Brother John why he had been hospitalized.  SUF ¶ 70.
Plaintiff also indicated that he would be requesting
accommodations to perform his job.  SUF ¶ 72; Response to SUF ¶
72.  From Plaintiff's perspective, the meeting ended without a
resolution of when or if Plaintiff would be going back to work,
SUF ¶ 73, or even if Plaintiff still had a job at Whitmarsh,
Response to SUF ¶ 73.

Either during the August 2005 meeting with Brother John or
sometime thereafter, Plaintiff told Brother John about his prior
hospitalization in November 2002 and suggested that Brother John
contact his medical providers.  SUF ¶ 71.  Plaintiff remained on
fully-paid leave from Whitmarsh while Whitmarsh awaited
Plaintiff's request for accommodations, began the process of
contacting his medical providers, considered his claimed
protected status under the ADA, and gathered information
concerning the ADA.  SUF ¶ 74.

### 7.  Written Request for Accommodation

On August 15, 2005, Plaintiff wrote another letter to
Brother John, the text of which stated:

> Pursuant to our conversation of 8/10/05, I have outlined
> the accommodation I am requesting.  I should point out

that I am still capable of the essential function of my job, viz, supervision, interaction, being ready to perform restraints.

1)     *The discretion to excuse myself temporarily from non-emergency situations that I find stressful or nauseating.*

SUF ¶ 75.[8]

On or about August 22, 2005, one of Plaintiff's physicians, W. Tyler Smith, M.D., sent a letter to Brother John regarding Plaintiff's request for an accommodation.  The letter stated:

Mr. Simon Richardson has been a patient under my care in my internal medicine practice for a number of years now.  He carries a diagnosis of Bipolar Type II, which is currently in remission. Mr. Richardson has been quite successful in controlling this illness without medication, provided he is able to modulate his level of stress.  Stress of high levels causes him to become anxious and nauseated and his best defense against it is to remove himself from the situation for a short time. As such I would suggest the following accommodation for him at work.  He needs to be able to leave a non-emergency situation that is causing him stress for at least 15 minutes in order to properly manage his symptoms.  If you have a[n]y questions[,] please contact me at the above number.  Thank you for your time.

SUF ¶ 76.

Plaintiff has never identified any major life activity that he is limited in performing.  SUF ¶ 77.  He testified at his deposition that he is not limited in his ability to work as the result of any impairment.[9]  Id.

---

[8] Although Plaintiff numbered the requested accommodation as "1)," it is the only accommodation requested.  SUF, Exhibit ("Ex.") E (Letter from Plaintiff to Brother John of 8/15/05).

[9] Plaintiff disputes this fact.  Response to SUF ¶ 77.  However, he fails to "identify the evidence establishing the dispute in accordance with the requirements of [District of Rhode Island Local Rule ("DRI LR") Cv 56] paragraph (a)(2)."  DRI LR Cv 56(a)(4). Accordingly, his challenge to the fact is rejected.  See Ruiz Rivera

### 8.  **Response to Request for Accommodation**

After receiving the correspondence from Plaintiff and Dr. Smith, Whitmarsh representatives, including Brother John and Dan O'Grady, discussed Plaintiff's request for accommodation and evaluated that request within the framework of the essential functions of Plaintiff's job within the organization.  SUF ¶ 78. Whitmarsh is regulated by DCYF, SUF ¶ 79, and DCYF requires Whitmarsh to maintain certain minimum staff-resident ratios at all times,[10] SUF ¶ 80.  In addition, residents must always be under the supervision of a specified number of staff members, depending on the number of residents in the facility.  Id. Verbal and/or physical conflicts between and among residents are common, and situations frequently arise where residents lash out at, or refuse to follow the instructions of, staff members.  SUF ¶ 81.  An essential component of a Whitmarsh residential counselor's job is to intervene in such conflicts with an aim of

---

v. Riley, 209 F.3d 24, 28 (1st Cir. 2000)("[W]e have held that noncompliance with such a rule, as manifested by a failure to present a statement of disputed facts, **embroidered with specific citations to the record,** justifies the court's deeming the facts presented in the movant's statement of undisputed facts admitted and ruling accordingly.")(bold added).

To the extent Plaintiff may contend that the evidence establishing the dispute is contained in Plaintiff's Affidavit ("Aff.") (Doc. #69), the Court has stricken that document.  See Memorandum and Order Granting Motion to Strike (Doc. #75).  Even if the Court were to consider Plaintiff's Affidavit, the document fails to establish the factual dispute.  See Melanson v. Browning-Ferris Indus., Inc., 281 F.3d 272, 277 n.5 (1st Cir. 2002)("A party may not create an issue of fact by submitting an affidavit in opposition to a summary judgment motion that clearly contradicts the affiant's previous deposition testimony.")(citing Morales v. A.C. Orssleff's EFTF, 246 F.3d 32, 35 (1st Cir. 2001); Colantuoni v. Alfred Calcagni & Sons, Inc., 44 F.3d 1, 5 (1st Cir. 2001)).

[10] Plaintiff attempts to argue that this statement is "false." Memorandum of Law in Support of Plaintiff's Objection to Defendants' Motion to Dismiss ("Plaintiff's Mem.") at 5.  However, Plaintiff's response to SUF ¶ 80 is that it is "Undisputed."  Response to SUF ¶ 80.  Accordingly, SUF ¶ 80 is deemed admitted.

diffusing them.  SUF ¶ 82.  These conflicts occur much more commonly on second shift than on third shift, owing to the fact that residents are generally sleeping during the third shift. SUF ¶ 83.

In or around October 2005, Plaintiff attended a meeting with Brother John at which Brother John explained to Plaintiff that he had been in contact with Dr. Smith about Plaintiff's medical condition and request for accommodation.  SUF ¶ 84.  Brother John told Plaintiff that in keeping with the information provided to him by Dr. Smith and Plaintiff, Whitmarsh was prepared to offer Plaintiff an adjusted work schedule whereby Plaintiff would work four eight-hour overnight shifts per week and one eight-hour daytime shift.  SUF ¶ 85.  Subsequently, on or about October 19, 2005, Plaintiff delivered a note to Whitmarsh from Dr. Smith which stated: "Mr. Richardson is depressed [and] will have to be out for the next 2 weeks."  SUF ¶ 86 (alteration in original). Plaintiff did not receive a formal response from Whitmarsh concerning Dr. Smith's note.  SUF ¶ 87.  However, Plaintiff remained out of work and continued to receive full pay and benefits.  Id.  During this time that he was out of work, Plaintiff was on paid leave status.  SUF ¶ 91.

### 9.  Request for Additional Accommodation

In a letter to Brother John dated October 20, 2005, Plaintiff also requested as an additional accommodation that he "be exempt from any assignments to the third (overnight) shift." SUF ¶ 88.  Based on Plaintiff's requested accommodation of being able to remove himself from situations he deemed stressful or nauseating, his communications with Dr. Smith, the essential functions of a residential counselor, and Whitmarsh's organizational mandates, Brother John believed the best and most appropriate way to provide a reasonable accommodation to Plaintiff was to adjust his work schedule so he would be working

14

primarily on the third shift, when inherently stressful conflicts
involving residents would be much less likely to arise.   SUF ¶
89.   During the approximately five-month period Plaintiff had
worked for Whitmarsh as a residential counselor on the second
shift, he was the recipient of physical aggression by residents
on many occasions and was required to perform numerous physical
restraints on residents.   SUF ¶ 90.

### 10.   First EEOC Complaint

On or about November 10, 2005, Plaintiff co-filed a charge
of discrimination with the Rhode Island Commission for Human
Rights ("RICHR") and the United States Equal Employment
Opportunity Commission ("EEOC").   SUF ¶ 106.   Plaintiff's charge
of discrimination contained the following allegations:

1.   I am being subjected to discriminatory terms and
conditions of employ[ment] by my employer, The
Whitmarsh Corporation.   I am currently on leave
from my position as Residential Counselor since on
or about August 4, 2005.

2.   Respondent has offered no substantial and/or
written reason for the discriminatory treatment I
am forced to endure.

3.   I believe I have been discriminated against on the
basis of my record of a disability (history of
psychiatric treatment) in that my employer allowed
my co-worker to subject me to disparate treatment
based on my protected class.   In or around July
2005, I informed my supervisor and co-worker, Ivy
Reeve,[11] that I was a qualified individual under
the Americans with Disabilities Act and sought a
reasonable accommodation.   My request was that I be
excused from non-emergency situations I deemed
stressful or nauseating. It was agreed that the
request was reasonable.   On or August 3, 2005, Ivy
Reeve attempted to interfere with my exercise of
the accommodation by trying to stop me from
excusing myself from a non-emergency conversation

---

[11] See n.4.

15

> with her and a juvenile client.  On or about August
> 4, 2005, I was sent home when I reported for my
> scheduled shift.    I have been on leave since.
> These actions are in violation of the Americans
> with Disabilities Act and applicable state law.

SUF, Ex. J (First Charge of Discrimination) at 2.

### 11.  Acceptance of Accommodation Offered

On or about November 23, 2005, Brother John and Plaintiff
again discussed Plaintiff's return to active employment and the
adjusted work schedule which Whitmarsh was offering him as an
accommodation for his claimed medical condition.  SUF ¶ 92.  In a
letter to Brother John dated November 28, 2005, Plaintiff
indicated that he would return to work on November 30, 2005, in
accordance with the adjusted work schedule offered to him by
Whitmarsh.  SUF ¶ 93.

On November 30, 2005, Plaintiff returned to active
employment with Whitmarsh, pursuant to the adjusted work schedule
Whitmarsh had provided him (four overnight shifts and one daytime
shift per week).  SUF ¶ 94.  Plaintiff continued to work this
schedule until sometime in 2007 or 2008.  SUF ¶ 95.  At some
point in 2007 or 2008, Plaintiff's schedule was adjusted so that
he would work five overnight shifts per week, Monday through
Friday.  SUF ¶ 96.  Plaintiff continues to work at Whitmarsh as
an overnight counselor.  SUF ¶ 97.  There have been no
interruptions in Plaintiff's employment since he returned to
active employment from leave status on November 30, 2005.  SUF ¶
98.

### 12.  Duties of Overnight Counselor & Contact with Booth

The essential duties and responsibilities of an overnight
counselor at Whitmarsh are essentially identical to those of a
residential counselor, except that the residents are generally
asleep for all or most of an overnight counselor's shift.  SUF ¶
99.  In the more than three years Plaintiff has worked as an

overnight counselor, Plaintiff has only needed to intervene in a very small number of conflicts involving Whitmarsh residents, and he has only been required to perform two or three physical restraints during that time.  SUF ¶ 100.

    During the time he was working as a residential counselor at Whitmarsh on the second shift, Plaintiff occasionally experienced feelings of stress and anxiety as a result of interacting with Booth.  SUF ¶ 102.  Booth continues to work at Whitmarsh, working almost exclusively during daylight hours, when Plaintiff is off-duty.  SUF ¶ 103.  Given their different work schedules, the opportunities for Plaintiff and Booth to interact at work have greatly decreased since Plaintiff began working on the overnight shift.  SUF ¶ 104.  Accordingly, as a result of being transferred to the overnight shift, the opportunities for Plaintiff to have tense or stressful interactions with Booth have decreased, and such interactions have, in fact, decreased since Plaintiff moved to the third shift.  SUF ¶ 105.

### 13.  Second EEOC Complaint

    On or about November 2, 2006, while his first charge of discrimination was pending, Plaintiff filed a second charge of discrimination with the RICHR and the EEOC, SUF ¶ 108. Plaintiff's Second Charge of discrimination contained the following allegations:

    1.   I am being subjected to discriminatory terms and conditions of employment, including retaliation for filing a previous charge of discrimination, by my employer, the Whitmarsh Corporation, and Brother John McHale.  I currently hold the position of a third-shift Residential Counselor.

    2.   Respondents offer no reason for the discriminatory treatment I am being forced to endure.

    3.   I believe I am being discriminated against because of my record of a disability (history of psychiatric treatment) and retaliated against for

17

> having filed a previous charge of disability
> discrimination against my employer. I agreed to
> work third shift after a temporary absence on or
> about November 28, 2005[,] and began my new hours on
> or about November 30, 2005. However, I only
> accepted third-shift after appealing for an English
> teacher position and was denied. Brother John
> McHale stressed that third shift was the "only way"
> the company would accommodate my disability and if
> I did not take the proposed schedule, I could
> resign and he would begin the termination process.
> The schedule I was placed on is inconsistent with
> Brother John McHale's words since it includes one
> first shift position. Furthermore, I work sixteen
> (16) hours in a row--from approximately 12 am to
> until 4 pm on Mondays at two separate locations.
> Similarly situated co-workers not in my protected
> class are not treated in this manner. These
> actions are in violation of the Americans with
> Disabilities Act and applicable state law.

SUF, Ex. K (Second Charge of Discrimination) at 2. As reflected
above, the second charge accused Defendants of discrimination and
also retaliation.

### 14.   **Disposition of Charges of Discrimination**

On March 29, 2007, Plaintiff's first charge of
discrimination was dismissed in its entirety with a determination
of no probable cause by the RICHR. SUF ¶ 110. Plaintiff did not
request a review of the RICHR's determination concerning his
first charge by the EEOC, nor did he request a right to sue
letter from either agency. SUF ¶ 111.

On March 29, 2007, Plaintiff received a split determination
from the RICHR concerning his second charge. SUF ¶ 112. With
respect to Plaintiff's second charge, a preliminary investigating
commissioner determined there was probable cause concerning
Plaintiff's allegations of retaliation, but no probable cause to

18

believe Plaintiff's allegations of disability discrimination.[12]
SUF ¶ 113.  Plaintiff did not request a review of the RICHR's
determination concerning his second charge by the EEOC, nor did
he request a right to sue letter from either agency with respect
to his Second Charge.  SUF ¶ 114.

Upon receiving the RICHR's split decision with respect to
Plaintiff's second charge, Whitmarsh and Brother John elected to
avail themselves of their right to remove the matter from the
RICHR and have the case heard and decided in court in accordance
with R.I. Gen. Laws § 28-5-24.1(c).[13]  SUF ¶ 115.  Having
received the election of Whitmarsh and Brother John to have
Plaintiff's retaliation allegations contained in his second
charge heard and decided in court, the RICHR issued a Notice of
Right to Sue to Plaintiff on or about May 2, 2007.  SUF ¶ 116.
This is the only Notice of Right to Sue Plaintiff ever received
from the RICHR or the EEOC.  SUF ¶ 118.

### 15.  Miscellaneous Matters

Since September 2006, Whitmarsh's staffing of teachers at
the Vision School has remained constant; accordingly, there have
been no openings for teachers at the Vision School at any time
since September 2006.[14]  SUF ¶ 119.  Plaintiff has never been a
member of any collective bargaining unit during his employment at
Whitmarsh.  SUF ¶ 120.  During his employment at Whitmarsh,
Plaintiff has never filed any administrative charge with the

---

[12] Plaintiff disputes this fact, see Response to SUF ¶ 113, but he
cites no evidence in support of his contention, see id.; see also n.9.
Moreover, the exhibit Defendants cite to support this fact, SUF, Ex. M
(Letter from Evora to Papazian-Ross of 3/30/07), clearly does so.
Plaintiff's challenge to this fact is therefore rejected.

[13] Plaintiff disputes this fact, see Response to SUF ¶ 114, but
his challenge is rejected for essentially the same reasons stated in
footnote 12.

[14] See n.13.

Rhode Island Department of Education or any other state
administrative agency regarding any claim under the Rhode Island
public school teacher certification laws or with respect to his
claim concerning Defendants' alleged violation of educational
rights of children.  SUF ¶ 121.

## III.  **Travel**

On or about July 20, 2007, Plaintiff filed the Complaint in
the Providence County Superior Court.  SUF ¶ 122.  Defendants
removed the action to this Court on August 16, 2007.  <u>See</u> Notice
of Removal (Doc. #1).  Defendants filed their Motion for Summary
Judgment on May 8, 2009.  <u>See</u> Docket.  Plaintiff filed his
response to the Motion on May 22, 2009, <u>see</u> <u>id.</u>, but his response
did not comply with Local Rule 56, and the Court issued an order
directing Plaintiff to comply with this rule.  <u>See</u> Order for
Plaintiff to Comply with Local Rule 56 (Doc. #64).  On June 16,
2009, Plaintiff filed the Response to SUF, a Statement of
Disputed Material Facts (Doc. #67), a Statement of Undisputed
Facts (Doc. #68), and an Affidavit (Doc. #69).  Defendants
responded by moving to strike the Statement of Disputed Facts and
the Affidavit.  <u>See</u> Defendants' Motion to Strike Plaintiff's
Affidavit and Plaintiff's Statement of Disputed Material Facts
(Doc. #72) ("Motion to Strike").

On July 21, 2009, the Court conducted a hearing on the
Motion for Summary Judgment and the Motion to Strike.
Thereafter, it took the matters under advisement.

## IV.  **Summary Judgment Standard**

"Summary judgment is appropriate when 'the pleadings,
depositions, answers to interrogatories, and admissions on file,
together with the affidavits, if any, show that there is no
genuine issue as to a material fact and that the moving party is
entitled to a judgment as a matter of law.'"  <u>Calero-Cerezo v.
U.S. Dep't of Justice</u>, 355 F.3d 6, 19 (1st Cir. 2004)(quoting

Fed. R. Civ. P. 56(c)).  "'A dispute is genuine if the evidence about the fact is such that a reasonable jury could resolve the point in the favor of the non-moving party.  A fact is material if it carries with it the potential to affect the outcome of the suit under the applicable law.'"  Santiago-Ramos v. Centennial P.R. Wireless Corp., 217 F.3d 46, 52 (1st Cir. 2000)(quoting Sánchez v. Alvarado, 101 F.3d 223, 227 (1st Cir. 1996)).

In ruling on a motion for summary judgment, the court must examine the record evidence "in the light most favorable to, and drawing all reasonable inferences in favor of, the nonmoving party."  Feliciano de la Cruz v. El Conquistador Resort & Country Club, 218 F.3d 1, 5 (1st Cir. 2000)(citing Mulero-Rodriguez v. Ponte, Inc., 98 F.3d 670, 672 (1st Cir. 1996)).  "[W]hen the facts support plausible but conflicting inferences on a pivotal issue in the case, the judge may not choose between those inferences at the summary judgment stage."  Coyne v. Taber Partners I, 53 F.3d 454, 460 (1st Cir. 1995).  Furthermore, "[s]ummary judgment is not appropriate merely because the facts offered by the moving party seem more plausible, or because the opponent is unlikely to prevail at trial.  If the evidence presented is subject to conflicting interpretations, or reasonable men might differ as to its significance, summary judgment is improper."  Gannon v. Narragansett Elec. Co., 777 F. Supp. 167, 169 (D.R.I. 1991)(citation and internal quotation marks omitted).

Nevertheless, the non-moving party may not rest merely upon the allegations or denials in its pleading, but must set forth specific facts showing that a genuine issue of material fact exists as to each issue upon which it would bear the ultimate burden of proof at trial.  See Santiago-Ramos, 217 F.3d at 53 (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256, 106 S.Ct. 2505 (1986)).  Moreover, the evidence presented by the

nonmoving party "'cannot be conjectural or problematic; it must
have substance in the sense that it limns differing versions of
the truth which a factfinder must resolve at an ensuing trial.'"
Mesnick v. Gen. Elec. Co., 950 F.2d 816, 822 (1st Cir. 1991)
(citing Mack v. Great Atl. & Pac. Tea Co., 871 F.2d 179, 181 (1st
Cir. 1989)).   "Even in employment discrimination cases where
elusive concepts such as motive or intent are at issue, summary
judgment is appropriate if the non-moving party rests merely upon
conclusory allegations, improbable inferences, and unsupported
speculation."  Benoit v. Technical Mfg. Corp., 331 F.3d 166, 173
(1st Cir. 2003)(internal quotation marks omitted); see also
Medina-Munoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st
Cir. 1990); Kriegel v. Rhode Island, 266 F.Supp.2d 288, 294
(D.R.I. 2003).

## V.  Discussion

### A.  Claims under R.I. Gen. Laws §§ 16-11-1 & 16-64-1.1(a)

Plaintiff alleges that, after Defendants removed him in
February or March 2005 from his position as a math teacher, they
replaced him with an individual who was not certified by the
State of Rhode Island to teach mathematics.  See Complaint
¶¶ 14,[15] 19; see also SUF ¶ 29.  Plaintiff claims that this was
improper because he is a certified teacher,[16] see id. ¶¶ 3, 13,
29, and Defendants' actions allegedly violated R.I. Gen. Laws §

---

[15] Although ¶ 14 of the Complaint states the year of Plaintiff's
removal from the classroom as "2006," Complaint ¶ 14, it is clear from
the remaining paragraphs of the Complaint and the SUF that this is a
typographical error and that Defendants removed Plaintiff from his
position as a math teacher in 2005, see SUF ¶ 29.

[16] Plaintiff is apparently certified to teach English although not
mathematics.  See Complaint ¶ 13 (alleging that at the beginning of
the 2004-05 school year Brother John "required Plaintiff to continue
teaching (out-of-certification) Mathematics").

16-11-1,[17] see id. ¶¶ 31-32, and § 16-64-1.1(a),[18] see id. ¶¶ 30, 84.

### 1.   Exhaustion of Administrative Remedies (Title 16 Claims)

"Under Rhode Island law there is a well established system designed to resolve disputes relating to educational matters." Laura V. v. Providence Sch. Bd., 680 F.Supp. 66, 70 (D.R.I. 1988)(citing R.I. Gen. Laws § 16-39-2).  Rhode Island General Laws §§ 16-39-1 to 16-39-7 provide for an administrative review process of "any matter of dispute ... arising under any law

---

[17] R.I. Gen. Laws § 16-11-1 provides in relevant part:

No person shall be employed to teach, as principal or assistant, in any school supported wholly or in part by public money unless the person shall have a certificate of qualification issued by or under the authority of the board of regents for elementary and secondary education ....  In case any city or town shall pay or cause to be paid any of the public money to any person for teaching who did not, at the time of teaching, hold a certificate, then the department of elementary and secondary education shall deduct a sum equal to the amount so paid from the amount of the state's money due, or which may thereafter become due, to the city or town, before giving his or her order in favor of the city or town for any of the public money under the provisions of §§ 16-1-10, 16-1-11, and 16-5-22.

R.I. Gen. Laws § 16-11-1 (2001 Reenactment).

[18] R.I. Gen. Laws § 16-64-1.1(a) states that:

Children placed in foster care by a Rhode Island licensed child placing agency or a Rhode Island governmental agency shall be entitled to the same free appropriate public education provided to all other residents of the city or town where the child is placed.  The city or town shall pay the cost of the education of the child during the time the child is in foster care in the city or town.

R.I. Gen. Laws § 16-64-1.1 (2001 Reenactment)(2008 Supp.).

relating to schools or education ...," § 16-39-1,[19] or for "[a]ny
person aggrieved in any ... matter arising under any law relating
to schools or education ...," § 16-39-2.[20]  <u>Chase v. Mousseau</u>,
448 A.2d 1221, 1223-24 (R.I. 1982)(citing statutes); <u>see also</u>
<u>Weber v. Cranston Pub. Sch. Comm.</u>, 245 F.Supp.2d 401, 407 (D.R.I.
2003)("Rhode Island law empowers the commissioner of elementary
and secondary education to hear appeals from any decision of a
school committee or to hear any appeal relating to any matter
arising under the laws relating to schools or education."); <u>Laura
V.</u>, 680 F.Supp. at 70 (describing administrative process).  "It
is well established that a plaintiff must exhaust administrative
remedies before seeking judicial review, and failure to do so
may, at the court's discretion, warrant dismissal of the claim."
<u>Chase</u>, 448 A.2d at 1224; <u>accord</u> <u>Rodrigues v. Rhode Island Dep't
of Educ.</u>, 697 A.2d 1077, 1079 (R.I. 1997); <u>Laura V.</u>, 680 F.Supp.
at 68-69 (granting motion to dismiss where plaintiffs "failed to

---

[19] R.I. Gen. Laws § 16-39-1 provides:

Parties having any matter of dispute between them arising
under any law relating to schools or education may appeal to
the commissioner of elementary and secondary education who,
after notice to the parties interested of the time and place
of hearing, shall examine and decide the appeal without cost
to the parties involved.

R.I. Gen. Laws § 16-39-1 (2001 Reenactment).

[20] R.I. Gen. Laws § 16-39-2 provides:

**Any person aggrieved** by any decision or doings of any school
committee or **in any other matter arising under any law
relating to schools or education** may appeal to the
commissioner of elementary and secondary education who, after
notice to the parties interested of the time and place of
hearing, shall examine and decide the appeal without cost to
the parties involved.

R.I. Gen. Laws § 16-39-2 (2001 Reenactment)(bold added); <u>see also</u> <u>Sch.
Comm. of  Providence v. Bd. of Regents for Educ.</u>, 429 A.2d 1297, 1300
(R.I. 1981)(finding a per diem substitute teacher who was terminated
was "aggrieved" person under § 16-39-2).

give the appropriate administrative bodies a chance to resolve their claims"); cf. Weber, 245 F.Supp.2d at 409 ("Courts may require exhaustion of remedies even where a particular statute does not explicitly so provide.").[21]

Plaintiff never filed any administrative complaint, claim, or appeal with the Commissioner of Elementary and Secondary Education or any other state administrative agency regarding any claim under the Rhode Island public school teacher certification laws stemming from his employment at Whitmarsh.  Thus, Plaintiff has failed to exhaust his administrative remedies as to his claims under §§ 16-11-1 and 16-64-1.1(a).  Accordingly, Defendants' Motion should be granted as to his claims under these statutes.  I so recommend.  See Weber, 245 F.Supp.2d at 407-11 (dismissing plaintiffs' complaint that school system denied their child a free appropriate education where plaintiffs did not exhaust their administrative remedies); Laura V., 680 F.Supp. at 68-69 (same); Chase, 448 A.2d at 1223-24 (finding claim that school committee failed to provide plaintiff's son with proper education barred because of failure to exhaust administrative remedies).

### 2.  Standing and Other Grounds for Summary Judgment

Because the Court has found that Plaintiff failed to exhaust his administrative rememdies with respect to §§ 16-11-1 and 16-64-1.1(a), the Court need not address Defendants' additional arguments for summary judgment with respect to claims based on these statutes, see Defendants' Memorandum of Law in Support of

---

[21] Richardson argues that the words "may appeal," R.I. Gen. Laws § 16-39-1, are "exhortatory rather than absolute," Plaintiff's Mem. at 16, and that § 16-39-5 ("Nothing contained in this chapter shall be construed as to deprive any aggrieved party of any legal remedy.") allows him to bring his claims under §§ 16-11-1 and 16-64-1.1(a) even though he has not availed himself of the administrative review process.  However, the case law cited above makes clear that a failure to exhaust administrative remedies justifies a court in dismissing the claims.  Richardson's contrary argument is rejected.

Their Motion for Summary Judgment ("Defendants' Mem.") at 23-26.

**B.  Claims under ADA and Corresponding State Law**

Plaintiff claims that after he exercised the "reasonable accommodation," Complaint ¶ 48, of excusing himself from a non-emergency situation which he found stressful or nauseating, he was placed on paid leave for four months and, thereafter, required to work a "bizarre," id. ¶ 58, work schedule.  See id. ¶¶ 45-59.  Plaintiff additionally claims that subsequently he was denied the opportunity for promotion in that Booth was promoted to a position which was not posted and for which Plaintiff alleges he was similarly or better qualified than Booth.  See id. ¶¶ 67-72.  Plaintiff further claims that in June 2007 Defendants gave him a tepid evaluation and a two percent raise (instead of a possible four percent raise).  See id. ¶ 80.  These actions, Plaintiff alleges, were discriminatory and/or retaliatory and violated his rights under the ADA, the Rhode Island Fair Employment Practices Act ("FEPA"), R.I. Gen. Laws §§ 28-5-1 to 28-5-42, the Rhode Island Civil Rights of People with Disabilities Act ("CRPDA"), R.I. Gen. Laws §§ 42-87-1 to 42-87-5, and the Rhode Island Civil Rights Act of 1990[22] ("CRA"), R.I.

---

[22] In finding that Plaintiff alleges a violation of the Rhode Island Civil Rights Act of 1990, the Court reads his Complaint liberally.  Plaintiff states that his "action is also brought under § 42-112-2." Complaint ¶ 86.  Rhode Island Gen. Laws § 42-112-2 authorizes a person whose rights have been violated under § 42-112-1 to commence a civil action.  See R.I. Gen. Laws § 42-112-2.  Section 42-112-1 provides in relevant part that:

> (a) All persons within the state, regardless of race, color, religion, sex, disability, age, or country of ancestral origin, have, except as is otherwise provided or permitted by law, the same rights to make and enforce contracts, to inherit, purchase, to lease, sell, hold, and convey real and personal property, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property, and are subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

Gen. Laws §§ 42-112-1 to 42-112-2.  <u>See</u> Complaint ¶¶ 67-83.

    **1.  Exhaustion of Administrative Remedies (ADA, FEPA, and CRPDA Discrimination Claims)**

    As a prerequisite to filing suit for employment discrimination under the ADA, FEPA and/or CRPDA, a plaintiff must pursue and exhaust his administrative remedies.  <u>See</u> <u>Brennan v. King</u>, 139 F.3d 258, 268 (1ˢᵗ Cir. 1998)("[C]laims under the ADA ... are subject to the exhaustion doctrine, which requires a claimant to pursue administrative remedies before filing suit."); <u>Paulo v. Cooley</u>, 686 F.Supp. 377, 382 (D.R.I. 1988)(granting summary judgment where plaintiff failed to comply with statutory prerequisites of FEPA); R.I. Gen. Laws § 42-87-5(a) (incorporating administrative process applicable to FEPA claims); <u>see also</u> <u>Chico-Velez v. Roche Prods., Inc.</u>, 139 F.3d 56, 58 (1ˢᵗ Cir. 1998)(noting "the ADA's mandatory administrative process"); <u>Horn v. Southern Union Co.</u>, 927 A.2d 292, 295 n.6 (R.I. 2007) (noting that "the FEPA provides for administrative agency involvement before actual in-court litigation commences").

    **a.  Plaintiff did not exhaust his administrative remedies with respect to his ADA claims.**

    Administrative remedies are exhausted with respect to claims of employment discrimination under the ADA by the timely filing of a charge with the EEOC or appropriate state agency and the receipt of a right-to-sue letter.  <u>Eklind v. Cargill Inc.</u>, Civil No. 3:07-cv-89, 2009 WL 2516168, at *8 (D.N.D. Aug. 14, 2009); <u>Stiefel v. Bechtel Corp.</u>, 497 F.Supp.2d 1138, 1146 (S.D. Cal. 2007)("The ADA incorporates the 'powers, remedies, and procedures' of Title VII of the Civil Rights Act of 1964, including the requirement that a 'right-to-sue' letter be obtained before a plaintiff brings an ADA suit.")(quoting 42

---

R.I. Gen. Laws § 42-112-1 (2006 Reenactment).

U.S.C. §§ 12117(a), 2000e-5(f)(1)); <u>Blalock v. Illinois Dep't of Human Servs.</u>, 349 F.Supp.2d 1093, 1095 (N.D. Ill. 2004)("Before a plaintiff can bring an action under Title VII or the ADA, she must first receive a right-to-sue letter from the EEOC."); <u>Dowd v. St. Columban's Retirement House</u>, Civ. A. No. 93-0265B, 1993 WL 762585, at *5 (D.R.I. Sept. 9, 1993)(finding plaintiff's failure to allege that he received a right-to-sue letter from the EEOC regarding his ADA claims to be "fatal"); <u>see also</u> <u>Bonilla v. Muebles J.J. Alvarez, Inc.</u>, 194 F.3d 275, 278 (1st Cir. 1999); <u>Dao v. Auchan Hypermarket</u>, 96 F.3d 787, 788 (5th Cir. 1996) ("procedure of filing charge with EEOC and receiving right-to-sue letter before bringing an ADA action is not jurisdictional, but plaintiff must exhaust these administrative remedies before suing in federal court")(internal quotation marks omitted).

Here, Richardson never requested or received a right-to-sue letter from the EEOC with respect to any of his ADA claims.  <u>See</u> SUF ¶¶ 111, 114.  He therefore failed to exhaust his administrative remedies with respect to these claims. Accordingly, the Motion should be granted as to these claims, and I so recommend.

> **b.  Plaintiff failed to exhaust his administrative remedies with respect to his FEPA and CRPDA claims for disability discrimination and alleged failure to accommodate.**

Like the ADA, FEPA and CRPDA prescribe an administrative process that a complaint must exhaust prior to filing any employment related claims in court.  <u>See</u> <u>Barber v. Verizon New England, Inc.</u>, No. C.A. 05-390ML, 2005 WL 3479834, at *2 (D.R.I. Dec. 20, 2005)("Under the RIFEPA, complainants must exhaust their administrative remedies prior to commencing judicial action."); <u>Paulo v. Cooley, Inc.</u>, 686 F.Supp. 377, 382 (D.R.I. 1988) (granting summary judgment as to any claims arising under FEPA where plaintiff failed to comply with statutory prerequisites

prior to commencing suit); R.I. Gen. Laws § 42-87-5(a)
(authorizing the RICHR to proceed in the same manner with respect
to complaints brought under CRPDA as complaints brought under
FEPA); id. (authorizing any complainant or respondent aggrieved
by a final order of CRPDA regarding a complaint made under CRPDA
to obtain judicial review); see also Rossi v. Amica Mut. Ins.
Co., 446 F.Supp.2d 62, 69 (D.R.I. 2005)(noting that language of
CRPDA "mirrors" that of ADA and applying similar analysis).
Under both the FEPA and CRPDA, a complainant must obtain a right
to sue letter from the RICHR as a prerequisite to filing suit.
See R.I. Gen. Laws § 28-5-24.1(a); id. § 42-87-5(a); see also
Barber v. Verizon New England, Inc., 2005 WL 3479834, at *2-3
(dismissing FEPA claims where plaintiff never obtained a finding
of probable cause or a right to sue letter); Paulo v. Cooley, 686
F.Supp. at 382 (finding plaintiff failed to comply with statutory
prerequisites to commencing a judicial action under FEPA where he
did not file a claim with RICHR or seek its permission to sue
employer).

      In the instant matter, Plaintiff filed two separate charges
of discrimination with the RICHR and the EEOC.  However, he only
obtained a right to sue letter from the RICHR with respect to the
second charge.  Accordingly, Plaintiff failed to exhaust his
administrative remedies regarding all allegations raised in his
first charge.  Therefore, those claims are not properly before
the Court and should be dismissed.  I so recommend.  See Barber
v. Verizon New England, Inc., 2005 WL 3479834, at *2-3; Paulo v.
Cooley, 686 F.Supp. at 382.

      Plaintiff likewise never received a right to sue letter with
respect to the claims of discrimination contained in his second
charge (as to which the RICHR found "no probable cause," SUF, Ex.
M (Letter from Evora to Papazian-Ross of 3/30/07)).  Instead,
pursuant to R.I. Gen. Laws § 28-5-24.1(c), Defendants elected to

have the allegations of retaliation alleged in Plaintiff's second
charge heard and decided in court.  Upon Defendants' election,
the RICHR issued a notice of right to sue to Plaintiff with
respect to the allegations of retaliation contained in his second
charge.  The RICHR was only authorized to issue a right to sue
notice with respect to the allegations of retaliation contained
in Plaintiff's second charge because the RICHR only found
probable cause on those specific allegations.  See R.I. Gen. Laws
§ 28-5-24.1(c)(1).  Section 28-5-24.1(c)(1) provides:

> As to cases commenced in the commission after July 8,
> 1999, the complainant or the respondent may elect within
> twenty (20) days **after receipt of a finding of probable**
> **cause** to terminate by written notice to the commission
> all proceedings before the commission and have the case
> heard in the superior court. In the event of an election
> to terminate the proceedings, the commission shall issue
> a right to sue letter to the complainant with a copy of
> the letter sent to all parties.

R.I. Gen. Laws § 28-5-24.1(c)(1) (bold added).  Accordingly,
because Plaintiff never requested nor received a right to sue
letter with respect to those allegations as to which the RICHR
found no probable cause (all claims except those for
retaliation), those allegations are not properly before the
Court.  Therefore, Defendants are entitled to summary judgment
with respect to those claims.  I so recommend.

### 2.  Statute of Limitations (CRA Claims)

Unlike FEPA, CRA contains no built-in statute of
limitations.  However, the Rhode Island Supreme Court has
determined that a one-year statute of limitations applies to
claims brought under CRA.  See Horn v. Southern Union Co., 927
A.2d 292, 295 (R.I. 2007)(engrafting onto the CRA the one-year
statute of limitations contained in FEPA).  A plaintiff is not
required to exhaust any administrative remedies prior to filing
suit based on an alleged CRA violation.  See Ward v. City of

<u>Pawtucket Police Dep't</u>, 639 A.2d 1379, 1382 (R.I. 1994); <u>see also</u> <u>Rathbun v. Autozone, Inc.</u>, 361 F.3d 62, 69 (1st Cir. 2004)(citing <u>Ward</u>).  Therefore, the one-year limitations period applicable to the CRA runs from the time of the alleged violation to the date Plaintiff files suit in court.  Plaintiff filed this action on July 20, 2007.  Accordingly, only claims which occurred on or after July 20, 2006, are actionable under the CRA.

Plaintiff returned to work and began working the adjusted schedule (which Whitmarsh agreed to provide him) on November 30, 2005.  Since that date, Plaintiff has continued to work for Whitmarsh as a residential counselor without any interruption or diminution in salary or benefits.  Accordingly, Plaintiff's claims for disability discrimination and failure to accommodate under CRA are time barred.  Defendants are entitled to summary judgment with this respect to those claims.  I so recommend.

### 3.  Merits of Disability and Failure to Accommodate Claims

Defendants persuasively argue that, even if the Court were to consider the merits of Plaintiff's disability and failure to accommodate claims, those claims fail as a matter of law.[23]  <u>See</u> Defendants' Mem. at 31-40.  Because the Court has already determined that the claims are procedurally barred, it is unnecessary to recount this analysis.  However, it is noted for

---

[23] Defendants argue that Plaintiff cannot demonstrate that he is substantially limited in the performance of any major life activity as the result of his single manic episode in November-December 2002.  <u>See</u> Defendant's Mem. at 33-34; <u>see also Doebele v. Sprint/United Mgmt. Co.</u>, 342 F.3d 1117, 1132 (10th Cir. 2003)(concluding plaintiff had not raised a fact issue as to whether she had a record of disability during the relevant period where the periods of her mental impairments were of limited duration).  Defendants additionally note that Plaintiff has never suffered an adverse employment action.  <u>See</u> Defendants' Mem. at 37 n.5; <u>see also McCoy v. City of Shreveport</u>, 492 F.3d 551, 559 (5th Cir. 2007)(stating that district court properly held that placing [plaintiff] on paid leave-whether administrative or sick-was not an adverse employment action).

Chief Judge Lisi's information.

### C.  Retaliation Claims

#### 1.  Law

In order to make out a prima facie case of retaliation based
on disability, a plaintiff must show that that he was engaged in
protected conduct, that he was subject to adverse employment
action, and that there was a causal connection between the
adverse employment action and the protected conduct.  See
Prescott v. Higgins, 538 F.3d 32, 43 (1st Cir. 2008); Calero-
Cerezo, 355 F.3d 6, 25 (1st Cir. 2004); Wright v. CompUSA, Inc.,
352 F.3d 472, 478 (1st Cir. 2003).  Once the plaintiff makes a
prima facie showing of retaliation, the McDonnell Douglas[24]
burden-shifting approach is employed and the defendant must
articulate a legitimate, non-retaliatory reason for its
employment decision.  Calero-Cerezo v. U.S. Dep't of Justice, 355
F.3d at 26.  If the defendant meets this burden, the plaintiff
must show that the proffered legitimate reason is in fact a
pretext and that the job action was the result of the defendant's
retaliatory animus.  Id.; see also Enica v. Principi, 544 F.3d
328, 343 (1st Cir. 2008)("the burden shifts to the plaintiff to
show that 'the proffered legitimate reason is in fact a pretext
and that the job action was the result of the defendant's
retaliatory animus'")(quoting Calero-Cerezo); Hodgens v. Gen.
Dynamics Corp., 144 F.3d 151, 170 (1st Cir. 1998)("it is the
employee's burden to show pretext").

#### 2.  Application

Plaintiff alleges that after filing his first charge of
discrimination Defendants retaliated against him by: 1) requiring
him to work third shift, see Complaint ¶¶ 58, 77; see also SUF,
Ex. K at 2; 2) by failing to promote and/or transfer him to the

---

[24] McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802, 93 S.Ct.
1817 (1973).

position of English teacher in the Vision School, see Complaint
¶¶ 67, 69-72;[25] SUF, Ex. A at 389-90; and 3) by giving him a
tepid evaluation and a two percent (as opposed to a four percent)
raise.[26]  See Complaint ¶¶ 80-82.  The proposition that a
transfer from the first to the third shift, unaccompanied by a
reduction in pay or significantly diminished job
responsibilities, constitutes an adverse employment action has
been rejected by several courts.  See Hunt v. Rapides Healthcare
Sys., LLC, 277 F.3d 757, 770 (5th Cir. 2001)(holding that
employer's offer of a night shift position which involved the
same duties and provided the same compensation as the day shift
position was not an adverse employment action under the anti-
retaliation provision of the Family and Medical Leave Act); id.
at 769 ("[A] shift change, without more, is not an adverse
employment action.")(citing Benningfield v. City of Houston, 157
F.3d 369, 377 (5th Cir. 1998)); see also Grube v. Lau Indus.,
Inc., 257 F.3d 723, 728 (7th Cir. 2001)("[W]ere we to hold that a
mere change in working hours would rise to the level of creating

_____

[25] It is not entirely clear that the denial of promotion about
which Plaintiff complains in ¶¶ 67-72 of the Complaint (involving Ivy
Booth) is the same "English teacher position," SUF, Ex. K at 2, about
which he complained in his second charge of discrimination, see id.
Yet, the RICHR only could have found probable cause with respect to
Plaintiff's allegations of retaliation involving the English teacher
position because it is the only position mentioned in the second
charge of discrimination which could possibly be viewed as a
promotion.  See SUF, Ex. M; see also id., Ex. K at 2.  In assuming
that it is the same position, the Court gives Plaintiff the benefit of
the doubt as there are no other allegations in the Complaint which
could be reasonably construed as referring to the English teacher
position.

[26] Although Plaintiff claims that Defendants' placement of him on
paid leave in August 2005 after he attempted to exercise a "reasonable
accommodation" for his disability was retaliatory, see Plaintiff's
Mem. at 2, this claim was contained in his first charge of
discrimination and is, therefore, procedurally barred.  See Discussion
section V.B.1.b. supra at 29 (finding that Plaintiff failed to exhaust
his administrative remedies regarding all allegations raised in his
first charge of discrimination).

a condition so objectively unbearable as to allow an employee to quit and then bring a claim of constructive discharge, employers would be in a most precarious position in adapting and maintaining employee's work schedules to fit within the parameters of their business needs."); id. ("[Plaintiff] offers little support, indeed she fails to offer a single citation to a case from any circuit, including ours, for the proposition that a mere transfer from a first to a second shift, unaccompanied by a reduction in pay or significantly diminished job responsibilities, can support a constructive discharge claim."). But see Ginger v. Dist. of Columbia, 527 F.3d 1340, 1344 (D.C. Cir. 2008)("inconvenience resulting from a less favorable schedule can render an employment action 'adverse' even if the employee's responsibilities and wages are left unchanged").

Assuming, however, that the transfer does constitute an adverse employment action, and further assuming that there was a causal connection between Plaintiff's filing of his first charge of discrimination on November 10, 2005, and Defendants' transfer of him to the third shift beginning on November 30, 2005, this claim of retaliation fails because Defendants have articulated a legitimate, non-retaliatory reason for their employment decision and Plaintiff is unable to show that the proffered legitimate reason is in fact pretext and that the job action was the result of Defendants' retaliatory animus.  See Calero-Cerezo, 355 F.3d at 26.

Defendants have submitted a declaration from Brother John in which he attests:

> that transferring Richardson from the second shift to primarily the third shift, when opportunities for stressful situations to arise would be greatly reduced, was the most appropriate and feasible way to accommodate Richardson's request [for the discretion to excuse himself for at least 15 minutes at a time from situations that he deemed stressful or nauseating].

34

Declaration of Brother John McHale (Doc. #57) ("McHale Decl.") ¶
7.  It is undisputed that verbal and/or physical conflicts
between and among residents frequently arise, that an essential
component of a residential counselor's job is to intervene in
such conflicts, and that such conflicts occur less frequently on
the third shift when residents are generally sleeping.  SUF ¶¶
81-83.  Thus, Defendants have articulated a legitimate, non-
retaliatory reason for transferring Plaintiff primarily to the
third shift.  Plaintiff points to no evidence in the record which
would permit a jury to find that this reason is pretext and that
the transfer was in fact the result of Defendants' retaliatory
animus, and the Court sees none.  Accordingly, as to this claim
of retaliation, Defendants are entitled to summary judgment.  See
Lewis v. City of Boston, 321 F.3d at 220 (affirming summary
judgment where plaintiff presented no credible evidence
demonstrating that the reasons advanced by defendant were
pretexts from which a fact finder could infer discriminatory
animus).  I so recommend.

Similarly, with respect to Plaintiff's claim that Defendants
retaliated by failing to promote and/or transfer him to the
position of English teacher, even assuming that the failure
constituted an adverse employment action and that there was a
casual connection between the failure and Plaintiff's protected
conduct, Defendants have provided a legitimate, non-retaliatory
reason for the action.  Brother John attests that "there have
been no openings for teachers at the Vision School at any time
since September 2006."  McHale Decl. ¶ 9.  Plaintiff identifies
no evidence in the record which indicates that this statement is
untrue.  Indeed, the Court rejected Plaintiff's challenge to SUF
¶ 119 for this reason.[27]

The law does not require an employer to terminate an

_____

[27] See n.14.

employee who already occupies a position in order to place
another employee in that job.  Just as the ADA does not require
an employer to accommodate an employee by creating a new job for
him, or by displacing another employee, see Enica v Principi, 544
F.3d at 342 ("an employer is neither required to provide an
employee with an accommodation of her choice nor to create a new
position for that employee"), an employer is not required to
remove one employee from an existing position in favor of another
in order to avoid a claim for unlawful retaliation.  Defendants
are entitled to summary judgment as to this claim of retaliation,
and I so recommend.

Lastly, a tepid evaluation and a two percent raise are
insufficient as a matter of law to establish the adverse
employment action necessary to maintain a viable retaliation
claim where there is no evidence in the record that Plaintiff was
entitled to a higher evaluation and pay raise.  See Amro v.
Boeing Co., 232 F.3d 790, 799 (10th Cir. 2000)(finding that
plaintiff's unhappiness with his evaluations and salary raise
does not constitute adverse action for purpose of a prima facie
case of retaliation where plaintiff "has not shown that his
performance merits a higher ranking"); see also Maclin v. SBC
Ameritech, 520 F.3d 781, 788 (7th Cir. 2008)(holding that the
denial of a discretionary bonus does not constitute an adverse
employment action); Tucker v. Merck & Co., 131 Fed.Appx. 852, 857
(3rd Cir. 2005)("even a negative evaluation that leads to a lower
than expected merit wage increase or bonus probably does not
constitute an adverse employment action").  Here there is no
evidence in the record that Plaintiff was entitled to a raise of
more than two percent in June 2007.  Accordingly, he has failed
to state a prima facie case for retaliation based on Defendants'

decision not to award him a more substantial pay raise.[28]
Defendants are entitled to summary judgment as to this claim of
retaliation, and I so recommend.

## VI.  **Summary**

Plaintiff's claims under R.I. Gen. Laws §§ 16-11-1 and 16-
64-1.1(a) are barred because he failed to exhaust his
administrative remedies with respect to such claims.  Similarly,
his substantive claims of discrimination and failure to
accommodate under the ADA, FEPA, and CRPDA are barred for the
same reason.  Any claims based on an alleged violation of the CRA
are barred by the statute of limitations.  Plaintiff's claims of
retaliation fail because he is unable to show that Defendants'
reasons for transferring him primarily to the third shift and
failing to promote or transfer him to the position of English
teacher were pretextual and that the real reason was retaliatory
animus.  Finally, his claim of retaliation based on Defendants'
giving only a two percent raise fails because there is no

---

[28] Even if the lukewarm evaluation and modest pay raise were
considered to be sufficient to constitute an adverse employment
action, the more than nineteen month gap between Plaintiff's filing of
his first charge of discrimination, see SUF, Ex. J, and this action
weighs against a causal connection between the two acts.  See Centro
Medico del Turabo, Inc. v. Feliciano de Melecio, 406 F.3d 1, 11 n.5
(1st Cir. 2005)("Although close temporal proximity between two events
may give rise to an inference of causal connection, see, e.g., Lewis
v. City of Boston, 321 F.3d 207, 219 (1st Cir. 2003), intervals similar
to the one involved here [roughly two years] are simply too long to
support such an inference, see, e.g., id. (noting that the passage of
eighteen months between the protected conduct and the allegedly
retaliatory action undercut the temporal proximity argument); Dressler
v. Daniel, 315 F.3d 75, 79-80 (1st Cir. 2003)(finding causal connection
tenuous because of passage of two years); Lewis v. Gillette Co., 22
F.3d 22, 25 (1st Cir. 1994)(finding that lapse of two years undermined
inference); see also Mesnick v. Gen. Elec. Co., 950 F.2d 816, 828 (1st
Cir. 1991)(holding that nine-month period between relevant events
weakened any inference of causation).").

evidence in the record which would permit a factfinder to conclude that Plaintiff was entitled to a greater raise.

## VII.  Conclusion

For the reasons stated above, I find that the Motion for Summary Judgment should be granted, and I so recommend.  Any objections to this Report and Recommendation must be specific and must be filed with the Clerk of Court within fourteen (14) days of its receipt.  <u>See</u> Fed. R. Civ. P. 72(b); DRI LR Cv 72(d). Failure to file specific objections in a timely manner constitutes waiver of the right to review by the district court and of the right to appeal the district court's decision.  <u>See</u> <u>United States v. Valencia-Copete</u>, 792 F.2d 4, 6 (1st Cir. 1986); <u>Park Motor Mart, Inc. v. Ford Motor Co.</u>, 616 F.2d 603, 605 (1st Cir. 1980).


<u>/s/ David L. Martin</u>
DAVID L. MARTIN
United States Magistrate Judge
December 8, 2009